No. 76.—JOHN MEALING, plaintiff in error, *vs.* JOHN PACE and others, defendants in error.

[1.] Has not the Governor, alone, under the Constitution, the power to fill a vacancy, in the Clerkship of the Superior Court? And are the Acts of 1826 and 1842, conferring this right upon the Inferior and Superior Courts, unconstitutional and void?   *Quere?*

[2.] The several Courts of this State have the power to adjourn, from day to day, or for a longer time, to suit their own and the public convenience, without a Clerk; and an *interregnum*, in the office of Clerk, would not deprive the Courts of this right.

[3.] The presumption against the completeness of a will, arising from a clause of attestation, without witnesses, may be rebutted by *any* extrinsic evidence, whatever; and proof, for this purpose, need not be restricted, alone, to the *declarations* of the testator.

[4.] No form is necessary, in a will disposing of personal property.

[5.] A will may be informal, yet complete; or formal, yet incomplete.   And the question, in every case, is not whether all is done which the law requires, but whether every thing has been done, which the testator thought necessary.

[6.] If it should appear that the testator intended to add forms which are unnecessary, still, the instrument will be bad, because *unfinished*.

John Mealing *vs.* John Pace and others.

[7.] The intention of the testator must not only be final, as to the dispository clauses of the will, but as to the *execution* also.

[8.] The presumption of Law is against a testamentary paper, with an attestation clause not subscribed by witnesses. The presumption is *slight*, provided the instrument be perfect in all other respects: yet, it must be rebutted by *some* extrinsic evidence.

[9.] To make a testamentary paper valid, the writer must have intended it to operate as a will, as it stood, without any further act, on his part, to complete it.

[10.] Although a paper may have all the legal requirements of a will, yet, if the testator, with a view to give it efficacy, has chosen to prescribe to himself a special mode of execution, and afterwards fails to comply with these formalities, the inference is that he had not definitely resolved on adopting the paper as his will.

[11.] The mere vague declarations of testators, that they have made their wills, can never serve, standing singly, to supply proof of due execution.

[12.] The caveators being the next of kin, and as such, entitled to the distribution of the estate, if the will fails, the *onus probandi* is upon those who seek to divert the property from the legal course of descent.

[13.] By the 57th section of the Judiciary Act of 1799, it is made lawful for the Judges of the Superior Courts to grant a new trial, wherever the verdict of the Special Jury is given, contrary to evidence and the principles of justice and equity.

[14.] By the recent Act of the Legislature " To regulate the granting of new trials, power is given to the Judges to exercise a sound discretion, in granting new trials, where the verdict may be ' decidedly and strongly against the weight of evidence' ". Does this Statute repeal or restrain the old Law? *Quere.*

[15] If the verdict of the Jury be not only contrary to, but entirely *without* evidence to support it, of course a new trial will be ordered.

Caveat to will.   Tried before Judge IVERSON, in Muscogee Superior Court, May Term, 1853.

The points made in this case, are all included in the motion for a new trial, which was made upon the following grounds:

1st. Because, at the time of the trial of said cause, which was had on the 11th day of June, 1853, to wit: at said Term, the said Court was illegally held, and the proceedings at said trial had, were void for this, to wit: that on Saturday, the 14th day of May, 1853, said Court, being then in session, was ad-

journed over till Monday, the 23d day of said May, that on Sunday, the 22d day of May, 1853, John R. Sturgis, the Clerk of said Court, died; that Monday, the day following, His Honor, Judge IVERSON, attended at the Court House, in said county, with the Sheriff and others, and ordered the said Sheriff to open Court, which he did, by proclamation; and after a short time, on account of the death of said Sturgis, His Honor again ordered said Sheriff to adjourn said Court, until the hour of 9 o'clock the next morning; that on the next morning, said Court was opened according to adjournment, and there being no Clerk, the said Judge then appointed Abraham B. Ragan as Clerk of said Court, for the time being; and after remaining a few minutes, said Judge, Sheriff, and others, left the Court House, without adjournment, His Honor saying he would suspend business informally, and without adjournment, until Monday, the 6th day of June then next, at 10 o'clock, A. M.

2d. Because said verdict was contrary to law.

3d. Because said verdict was contrary to evidence.

4th. Because said Court erred in refusing, when requested by caveator, to charge the Jury, that if the will propounded disposes of real and personal property, and has an attesting clause, but no witnesses, they must find against the will, as to the *personal* as well as the *real* property, unless the testator declared it as his intention that it should be good as to his personal estate.

The following is the brief of the evidence in behalf of Propounders:

*Testimony of Mrs. Mary Pace, in behalf of Propounders, by Interrogatories.*—To the first interrogatory, she answers: She knows the parties.

*Second Interrogatory.*—Please state whether you freely and fully sign the release hereto annexed, and whether, after signing and sealing the same, you have any interest, either directly or indirectly, in the event of this suit, or in the establish-

ment of the last will and testament of your late husband, William Pace, senior, deceased, or in his estate, with or without said will?

*Answer.*—To the 2d interrogatory she answers: I freely and fully, of my own accord, sign the release referred to. I have no interest, either direct or indirect, in the event of this suit; neither have I, in the establishment of the last will and testament of William Pace, lately deceased, or in his estate, with or without said will.

*Interrogatory Third.*—Please look upon the original paper hereto annexed, purporting to be the last will and testament of said William Pace, senior, and state all you know about it?

State in whose hand-writing it is, and whether you are acquainted with the hand-writing, from having seen the party write?

State if you know when and where it was written, and all the facts and circumstances by which you are enabled to state the time and place?

*Answer to Interrogatory Third.*—I have examined the paper referred to, and know it to be the will and wish of my late husband, William Pace, senior, that his personal estate should be bequeathed, as stated in said will. It is in the hand-writing of my late husband, and I know it to be the last will he made. The will referred to was written in the month of July or August—about the last of July or the first of August, in the year 1850. It was written at his residence, in Muscogee county.

*Interrogatory Fourth.*—Look, particularly, upon the interlineations in said will, and state in whose hand-writing they are, and all you know about their being made, and why they were made?

*Answer to the Fourth.*—I have examined said will, and the interlineations, and it is in the hand-writing of my deceased husband. I saw him write the name of Chany, in the place of Lany, whose name was first written in the body of the will; and he done it at my suggestion. After he had written the will, he called me up, (I was lying down,) and read it over to me, and wished to know if I was satisfied with it. I stated

that as Lany was old, I would prefer her to stay with the children, instead of being sent to Alabama, the place where William Pace, Jr., resides, and requested him to do so; and he then made the erasure, and wrote the name of Chaney in lieu thereof; and as Lany was old, and had been a faithful servant, requested, in his will, that his children should take care of her, after my death.

*Interrogatory Fifth.*—Look upon the names of the negroes mentioned in said will, and state if any of them, and which of them, were born since February, 1847, and when such negroes were born, and how you know the time when they were born?

*Answer to Interogatory Fifth.*—The negro girl Chany was born in August, 1847; the negro girl Susan was born in the month of May, 1849. I know these facts from a private record kept by my late husband, of the births of his negroes; also from the fact of the marriage of my grand-daughter, Nancy Pace.

*Interrogatory Sixth.*—Relate all you know or remember, in relation to said will, hereunto annexed, that will go to show that it is the last will and testament made by your husband, and that he was of sound and disposing mind and memory, when he made it?

*Answer to the Sixth.*—I know that the paper referred to, is the last will and testament of my late husband, from the facts stated in my answer to the fourth interrogatory; and I am fully assurred that at the time the will referred to was made, my late husband was of a sound mind and memory, and well understood what he was doing; and from my long acquaintance with him, and his individual affairs, he showed no want of his usual memory, up to the time said wlll was made.

## CROSS INTERROGATORIES.

*First Interrogatory.*—At whose instance or persuasion do you sign the annexed release, and what is the understanding under which you do so? State fully.

*Answer to the First.*—I signed the release at the persuasion of no one, but of my own accord, as stated in my first answers.

There is no understanding with any person about signing the same.

*Second Interrogatory.*—In whose hand, and where did you first, after his death, see said paper writing, purporting to be the will of William Pace? How long after his death was it that you first saw said paper writing? Did you see the same, or any part of it, written?

*Answer to the Second.*—Three days after the death of my husband, the will referred to was found in the desk of my late husband, and was taken out, I think, by Jesse Cox, Esq., and a part was then read by him. I saw it wrote, as stated in my direct answer.

*Third Interrogatory.*—Why did said William Pace so dispose of property? Why did he not make all of his children equal in the division of it? What prejudice had he against the children of his deceased daughter, formerly wife of James. G. Burt? Was he not desirous of putting them as nearly as, possible upon the same footing with his other heirs? What did he say about this, and when and how came he to say so?

*Answer to the Third.*—William Pace, senior, my late husband, made this disposition of his property, because it was his wish and will to do so. He had given others property before, and said he had given them all he intended to give them; he had no prejudice against the children of James G. Burt; and it will appear, by reference to the annexed will, that they have received some ten negroes; and he considered them provided for, and said he should give them no more.

*Fourth Interrogatory.*—Was said William Pace disposed to prefer some of his children to others, and if so, what was the occasion of his dislike of the children of said daughter?

*Answer to the Fourth.*—I do not know that my husband was disposed to show any preference to some of his children over others, neither was there any dislike, that I know of, to the daughters of Mr. James G. Burt, his grand children.

*Fifth Interrogatory.*—When was the word "Chany" interlined in said writing? how long after the rest was written? and relate all you know to benefit caveator, &c.

*Answer to the Fifth.*—I have already answered that question in my direct answers. I have stated fully all I know.

(Signed)                          her
                            MARY ⋈ PACE.
                                  mark.

## RELEASE, ATTACHED TO INTERROGATORIES.

GEORGIA, HARRIS COUNTY.

These presents witness that I, Mary Pace, widow and relict of William Pace, senior, late of Muscogee county, deceased, do hereby, for the consideration of one dollar, as well as for and in consideration of the love and affection which I bear my children, who are legatees under the last will and testament of said deceased, do hereby relinquish all manner of right and claim which I may have on the personal estate and property of said deceased, either under his last will and testament, or otherwise; and do likewise hereby renounce all claim and right to administer said estate as executrix, next of kin, or otherwise; and all manner of interest, either as executrix, or heir, or legatee, in the said personal property, left by said deceased, whether embraced in said will or not.

In witness whereof, I have hereunto set my hand and seal, this 11th day of April, 1851.

                                  her
                    MARY ⋈ PACE, [SEAL.]
                                  mark.

Signed and sealed in presence of
    MICHAEL N. CLARKE,
    JESSE COX, J. P.

## WILL PROPOUNDED, ATTACHED TO THE INTERROGATORIES.

GEORGIA, MUSCOGEE COUNTY:

In the name of God, Amen. I, William Pace, senior, of the county and State aforesaid, being in perfect mind and memory, but weak in body, and calling to mind the mortality of my body, and knowing that it is appointed for all men to die,

do make and ordain this my last will and testament, as touching my worldly estate, wherewith it has pleased God to bless me in this life. I give and dispose of the same in manner as follows :

*Item* 1. I give my soul to God that gave it, and desire my executrix or executor, to have my body decently buried, that it may return to dust from which it came, according to the word of the Lord.

*Item* 2. I desire that all my estate, or that all my property of every description, remain in the hands of my wife, Polly Pace, during her life, and that she keep it together as it now is, and that as my just debts become due, that she pay them out of the profits arising from the same. At the death of my wife, I want the property, as I will it away, to fall into the possession of those I will it to, and for them to take it in possession, and the balance of my estate, not willed away, of every description, to be sold by my executors at public sale, and the money arising from the sale to be equally divided among my living children, that is, them that is alive, when the sale takes place ; I mean my sons only, to divide the money arising from the sale ; and them only that are alive at that time.

*Item* 3. At the death of my wife, I give unto my son William Pace, Jack, Ellick and Chany.

*Item* 4. At the death of my wife, unto my son Clement Pace, Joe, Tom and Burwell.

*Item* 5. At the death of my wife, I give unto my son Stephen Pace, Peter, Minger, and Hanner, and one he had before.

*Item* 6. At the death of my wife, I give unto my son John Pace, Ned, Amy and her youngest child, Susan, and Sam he had before.

*Item* 7. At the death of my wife, I give unto my son Elkanah, Frank, Caty, Rose, Lewis and Philip, and Bartlett he had before.

*Item* 8. At the death of my wife, I give unto my daughter Elizabeth Weddington, one negro girl named Tildy, and her children, and Isham and Hester his wife, and the lot of land she lives on, including the house she lives in.

*Item* 9. At the death of my wife, I give unto Caty Mays' children, John Mays' first wife, deceased, Rose and her children, to be equally divided between Caty's children.

*Item* 10. At the death of my wife, I give unto my daughter, Polly May, Philis and her children, to be equally divided between Polly's children at her death. I also give unto Polly, my daughter, a negro girl, named Lucy and Judy.

*Item* 11. At the death of my wife, I give unto my daughter Lucy Burt's two children, Martha and Mary, Dynah and her children, to be equally divided between them; and if either of them should die without an heir of their body, I want the other to have the whole of the negroes.

*Item* 12. At the death of my wife, in addition to what I have given to my son Clement Pace, I give him one half of Lot number 243, the half to be laid off joining John Mullin's and Clement Pace's.

*Item* 13. At the death of my wife, in addition to what I have given my son Elkanah, I give him one lot of land joining him, number not recollected. I bought it of McClary, lying on the creek, below Elky's mill.

*Item* 14. I also appoint my wife, Polly Pace, executrix to this my last will, (alone) and at her death, I want and appoint each of my sons to have equal powers as executors, that is, my living sons at that time, and in witness hereof, I have hereunto set my hand and seal, this February 4th, 1847, in presence of us. I want Lany to live amongst my children, and for them to take care of her after the death of my wife.

WILLIAM PACE, [SEAL.]

JESSE COX.—Jesse Cox testified, that he had been desired by some of the family, to be at the house of William Pace, senior, the day after the burial, to be present in examining his papers. He went. They opened a drawer and commenced searching for a will. This was on Tuesday, the day after the burial on Monday. The persons present, were Mrs. Mary Pace, the widow, John, Elkanah, Clement and Stephen Pace, James G. Burt, Richard Dent, and some others. They requested witness to examine the papers. He opened the draw-

er and commenced the search, and looked through all the large papers that they thought might be wills, but did not particularly examine the smaller ones, that appeared to be of less importance.   Amongst the papers, they found the one propounded, together with four others—shown to the witness and identified—purporting to be wills ; besides another which was partially written.   Only the one dated in 1832 was signed, sealed and regularly witnessed.   The four others were signed and sealed by William Pace, each with an attesting clause, but no witness.   The one partially written was not signed.   Three of said wills were dated, each the same day in February, 1847, and another in August, 1847.   Witness further testifies, it was the common belief of all present, that no one of said papers was valid, as the will of old Mr. Pace, for the reason that they were not witnessed.   Clement Pace, however, said he believed his father had a will, and that he might have left it in the hands of Judge Alexander, or of Wm. Clarke.   One of said papers was read, but whether the one propounded was the one read at the time, he could not say positively.   There was a good deal of examining and talking about the wills, and it might have been the one read, but his recollection was not distinct.   After they had failed to find a will, he suggested to them, that, as the heirs were all of age, it would be as well for them to have a friendly division of the property among themselves.   He didn't remember that any one present agreed to the proposition, except Mr. Burt.   After the examination, John and Elkanah left, as he understood, in search of a will.   During the examination, or as they were about to go into it, Clement Pace remarked, that that morning, when he got there, he found the desk unlocked, but that he had not interrupted the papers ; they were all just as he found them.   He further testified that the old man Pace, was a close, particular man in his business ; was in the habit of writing bonds and deeds, and such like for his neighbors, but never knew of his writing a will.; and that he considered the old man quite competent to make his will, up to the time of his death, as far as he knew anything of his mind.

ALEXANDER H. COOPER.—Alexander H. Cooper, Esq., testified, that he had seen Wm. Pace, senior, write several times; and believed the paper writing propounded to be in his handwriting. That he was a sensible man, pretty close in his business dealings. That he had been security for his son William, on several notes in the hands of witness for collection, and had the paying of the greater part of them to do; and this was the occasion of witness knowing anything about his business habits, or the capacity of his mind. He believed him competent to make a will up to the last time he saw him, not long before his death.

DUDLEY WILLETT.—Dudley Willet testified, that he had known old Mr. Pace for several years; that he was very particular in his business; knew him to write bonds, deeds, &c., for his neighbors, was particular to have all his instruments witnessed and done up according to law; that if he had not known how many witnesses were necessary to a will, he ought to have known, as he was a very particular man in all his business; and should believe him capable of making his will, up to the time of his death, as far as he knew.

L. M. BIGGERS.—Lorenzo M. Biggers testified, that he should think Mr. Wm. Pace, senior, was quite capable of making his will; knew of his doing a good deal of writing, such as bonds, deeds and the like, for the neighborhood. He was very particular in fixing up his instruments and having them witnessed, so as to have them stand.

All the five wills and the part of a will were proved to be in the hand-writing of old Mr. Pace, and introduced in evidence.

## COPIES OF THE WILLS OF WILLIAM PACE,
*Introduced in evidence.*

In the name of God, amen! I, William Pace, of the County of Putnam, and State of Georgia, being very sick and low in body, but in perfect mind and memory, thanks be to God for it, calling to mind the mortality of my body, and knowing that it is appointed for all men once to die, do make and ordain this my last will and testament, and touching my worldly estate,

wherewith it has pleased God to bless me in this life, I give, and devise, and dispose of the same in manner as follows :

*Item* 1. I give and bequeath to my daughter Elizabeth Weddington, one negro girl named Tildy, for her peaceably to possess.

*Item* 2. I give and bequeath to my daughter Polly May, one negro girl named Fillis, and her two children, for her peaceably to possess.

*Item* 3. I give and bequeath unto my daughter Catherine May, one negro girl named Rose, and her two children, for her peaceably to possess.

*Item* 4. I give and bequeath unto my daughter, Lucy Burt, one negro girl named Diner, and her two children, for her peaceably to possess.

*Item* 5. I give and bequeath unto my son William, three hundred dollars, which he has received.

*Item* 6. I give and bequeath unto my son Clement, three hundred dollars, which he has received.

*Item* 7. I give and bequeath unto my son Stephen, three hundred dollars, which he has received in a negro.

*Item* 8. I give unto my son John, one-half of a certain lot of land I bought of Smith Scrogin, No. 327, and a certain bit on this side of the creek, willed to me by my father, I suppose about 8 or 10 acres. I also give unto John the houses where I formerly lived, and the land below the old path, leading from Mrs. Terril's to the meeting-house, and all to the left of said path and round it, till it comes to the side of the hill, above the spring, to the old road leading to Holt's ferry, including the houses and open land around the houses and springs where I used to live, called my old place, and one negro man named Jack, one filly called Beck, one feather bed and furniture, one cow and calf, one sow and pigs, and leave it in the power of my wife to give him house furniture and tools.

*Item* 9. I give unto my son Elkanah, at the death or marriage of his mother, the house and land where I now live, deeded to me by my brother Hardy Pace, with all its appurtenan-

ces, Nos. 314, 315, in three pieces, containing 126 acres, be the same more or less; also, the land lying to the right of the road, leading from where I now live to Garner's ferry, down to Mrs. Terril's path, thence with said path to the corner of the fence, to the road leading from where I live to the meeting house, thence with said road to the beginning; also, at my death, I give unto Elkanah one negro boy named Bartlett, one horse, saddle and bridle, worth one hundred and twenty dollars; one feather bed and furniture, one cow and calf, one sow and pigs, and leave it in the power of my wife to give him house furniture and tools.

*Item* 10. I give unto my wife, Polly Pace, during her natural life or widowhood, the use of the house and land where I now live, with all the rest of my lands not willed away before, and house furniture and stock of every description, with all the rest of my property, of every description whatever, for her peaceably to possess, during her natural life or widowhood, and at her death or marriage, I give unto my nine children as follows:

*Item* 11. I give unto my son William one negro named Isham.

*Item* 12. I give unto my daughter, Elizabeth Weddington, one negro boy named John.

*Item* 13. I give unto my daughter, Polly May, one negro boy named Tom.

*Item* 14. I give unto my daughter, Catharine May, one negro boy named Néd.

*Item* 15. I give unto my daughter, Lucy Burt, one negro boy named Mingo.

*Item* 16. I give unto my son Stephen, one negro boy Peter.

*Item* 17. I give unto my son John, one negro woman named Hester.

*Item* 18. I give unto my son Elkana, one negro girl, named Chany.

*Item* 19. I give unto my son Clement, one negro boy named Sam, and a certain piece of land joining him, on the other side

of the creek, supposed to be four acres and a quarter, I bought of my brother Hardy Pace.

*Item* 20. I give unto my wife, Lany and Joseph, or Arter, for her to dispose of amongst my children, as she thinks proper, at her death; and she is at liberty, and can, at her option, give to either or all of my nine children, the negroes last willed to them, when she is so minded.

*Item* 21. At the death or marriage of my wife, I want all the rest of my property, not disposed of, to be equally divided between my nine children.

*Item* 22. I also want all my just debts to be paid as they come on demand, out of my present crop, and the debts owing to me; and if either of the children should die before they receive the property left to them, I want their property equally divided between the others alive; and if either of their negroes should die before they receive them, I want them to have another of equal description, of the balance of my estate not willed away.

*Item* 23. I also give unto my son Elkanah, at the death of his mother, the balance of the lot of land I bought of Jerry Edgot, not before willed to him and John.

*Item* 24. I also appoint my wife, Mary Pace, executrix of this my last will. In witness whereof, I have hereunto set my hand and seal, this April the 30th, 1832, in presence of

JOSEPH MORELAND,
JOSEPH MOSELY,             WILLIAM PACE. [SEAL.]
DAVID T. WHITE.

## COPY WILL OF WILLIAM PACE, SENIOR.

GEORGIA,       }    In the name of GOD, amen. I, William Muscogee County. } Pace, senior, of the county and State aforesaid, being in perfect mind and memory, but weak in body, and calling to mind the mortality of my body, and knowing that it is appointed for all men to die, do make and ordain this my last will and testament, as touching my wordly estate, wherewith it has pleased God to bless me in this life. I give and devise and dispose of the same, in manner, as follows:

*Item* 1. I give my soul to God that gave it, and desire my executrix, or executors, to have my body decently buried, that it may return to dust from whence it came, according to the word of the Lord.

*Item* 2. I desire that all my property, of every description, remain in the hands of my wife, Polly Pace, during her life, and that she keep it together, as it now is; and as my just debts come due, that she pay them out of the profits arising from the same.   At the death of my wife, I want the property, as I will it away, to fall into the possession of them I will it to, and for them to take it in possession; and the balance of my estate, not willed away, of every description, to be sold by my executors, at public sale, and the money arising from the sale, to be equally divided among my living children; that is, them that are alive at the time when the sale takes place.

*Item* 3. At the death of my wife, I give unto my son William Pace, a negro man named Jack, and Frank, and Ellick.

*Item* 4. At the death of my wife, I give unto my son Clement, one negro man named Tom, and Joe, a man, and Lucy, a girl.

*Item* 5. I give unto my son Stephen, a negro man he has had, and Peter and Burwell.

*Item* 6. I give unto Elkanah Pace, at the death of his mother, Bartlett, a man, and Caty, a girl, and Rose, a girl, and two boys, Lewis and Phillip.

*Item* 7. At the death of my wife, I give unto my son John, Sam, a man, and Amy, a woman, and her youngest child.

*Item* 8. I give unto my daughter Betsy, or Elizabeth Weddington, at the death of my wife, a negro girl named Tildy, and her children; and Isham and Hester, and half of the lot of land she lives on, including the house she lives in.

*Item* 9. At the death of my wife, I give unto Caty May's children, John May's first wife, deceased, Rose and her children, to be equally divided between Catharine's children.

*Item* 10. At the death of my wife, I give unto my daughter Polly May, Fillis and her children, to be equally divided between Polly's children: and at her death, I also give unto

Polly a negro girl, her life-time, named Judy; and at her death, I give said negro Judy to William May, Polly's son, and her increase.

*Item* 11. I give unto my daughter Lucy Burt's two children, Marty and Mary, Dinah and her two children, to be equally divided between them; and if either of them should die, without an heir of their body, I want the other to have all of the negroes.

*Item* 12. I also appoint my wife, Polly Pace, executrix of this my last will, (alone,) and at her death, for each of my sons to have equal power as executors; that is, my living sons at that time ; in witness whereof, I have hereunto set my hand and seal, this February 4th, 1847, in presence of us.

WILLIAM PACE, Sr. [seal.]

I also give unto my son Elkanah Pace, a negro man named Mingo, by his paying unto my estate four hundred dollars, 12 months after the death of my wife; and I also give unto my son John Pace, a negro girl named Hannah, by his paying to my estate one hundred dollars, twelve months after the death of my wife. I also desire that Lany, after the death of my wife, live amongst my children, when she thinks proper. This given under my hand and seal, this February 4th, 1847, in presence of us.     WILLIAM PACE, Sr. [seal.]

### COPY WILL OF WILLIAM PACE, SENIOR.

Georgia,     } In the name of God, amen. I, William Pace, senior, of the county and State aforesaid, being in perfect mind and memory, but weak in body; and calling to mind the mortality of my body, and knowing that it is appointed for all men to die, do make this my last will and testament, as touching my worldly estate, that it has pleased God to bless me with in this life. I give and devise and dispose of the same, in manner, as follows:

*Item* 1. I give my soul to God that gave it, and desire my executor to have my body decently buried, that it may return to dust, from whence it came, according to the word of the Lord.

*Item* 2. I desire that all my property, of every description whatever, remain in the hands of my wife Polly Pace, during her natural life, and that she keep it together, as it now is; and as my just debts come due, that she pay them out of the profits arising from the same.    At the death of my wife, I want the property, as I will it away, to fall into the hands of them I will it to, and for them to take it in possession; and the balance of my estate, of every description, not willed away, to be sold by my executors, at public sale, and after paying my just debts, or the debts of my estate, to be equally divided between my living children; I mean them that are alive at that time, when the sale takes place.

*Item* 3. At the death of my wife, I give unto my son William Pace, one negro man named Jack, and one boy named Frank.

*Item* 4. At the death of my wife, I give unto my son Clement Pace, one negro boy named Tom, and a man named Joe.

*Item* 5. At the death of my wife, I give unto my son Stephen Pace, one man named Peter, and one boy named Burwell.

*Item* 6. At the death of my wife, I give unto my son John Pace, one negro man named Sam, and one negro boy named Ned.

*Item* 7. At the death of my wife, I give unto my son Elkanah Pace, one negro man named Bartlett, and Amy and her youngest child, and Chany and her youngest child.

*Item* 8. At the death of my wife, I give unto my daughter Elizabeth Weddington, one half of the lot of land she lives on, including the houses where she lives in, to be taken off of the upper end of said lot, joining Byers and my son John; also, a negro woman named Tildy, and her children, and Isham and his wife.

*Item* 9. I give unto Catharine May's children, formerly John May's wife, my daughter, Rose and her children, to be equally divided between Catharine's children.

*Item* 10. At the death of my wife, I give unto Nancy Pace, son William's daughter, Judy, a girl, and Ellick, a boy.

*Item* 11. At the death of my wife, I give unto my daugh-

ter, Polly May's children, Philis and her children, to be equally divided between them, at the death of my daughter Polly May.

*Item* 12. At the death of my wife, I give unto my daughter Lucy Burt's children, Martha and Mary, Diner's two children, to be equally divided between them.

*Item* 13. At the death of my wife, I give unto my granddaughter, Mary Petty, one negro girl named Caty.

*Item* 14. The other negroes not given away, I leave with my wife, to dispose with as she thinks proper, amongst our living children, at her death or before.

*Item* 15. I also appoint my wife, Polly Pace, executrix to this, my last will, (alone,) and at her death, for each of my sons to have equal powers as executors; that is, my living sons at that time. In witness whereof, I have hereunto set my hand and seal, this February 4th, 1847.

WILLIAM PACE, [L. S.]

*Item* 16. At the death of my wife, should she fail to dispose of the negroes, as above empowered, I want my executors to sell them at public sale, if they can't divide them satisfactorily amongst themselves; I want the negroes to be divided between my five sons, William, Clement, Stephen, John and Elkanah, and no one else to bid at the sale, and no one else to share in the money arising from the sale of the negroes, if there should be a sale. Signed by my own hand, this February the 4th, 1847.     WILLIAM PACE, [L. S.]

### COPY WILL OF WILLIAM PACE.

In the name of God, amen! I, William Pace, senior, of the county and State aforesaid, being in perfect mind and memory, but weak in body, and calling to mind the mortality of my body, and knowing that it is appointed for all men to die, do make and ordain this my last will and testament, as touching my worldly estate, whereof it hath pleased God to bless me with in this life. I give, and devise, and dispose of the same, in manner as follows:

*Item* 1. I give my soul to God that gave it, and desire my

executrix and executors, to have my body decently buried, that it may return to dust from whence it came, according to the word of the Lord.

*Item* 2. I desire that all my property, of every description whatever, remain in the hands of my wife Polly Pace, during her natural life, and that she keep it together, as it now is, and as my just debts come due, that she pay them out of the profits arising from the same. At the death of my wife, I want the property, as I will it away, to fall into the hands of them I will it to, and for them to take it in possession, and the balance of my estate, of every description, not willed away, to be sold by my executors, at public sale, and divided between my living children—I mean them that are alive at that time, when the sale takes place.

*Item* 3. At the death of my wife, I give unto my son William Pace, one negro man named Jack, and one boy named Frank, and

*Item* 4. At the death of my wife, I give unto Clement Pace, one negro man named Joe, and one named Tom, and a boy named Phillip.

*Item* 5. At the death of my wife, I give unto my son Stephen Pace, one negro named Peter, and a boy named Burwell.

*Item* 6. At the death of my wife, I give unto my son John Pace, one negro man named Sam, and one named Ned, Rose, a girl.

*Item* 7. At the death of my wife, I give unto my son Elkanah Pace, a negro man named Bartlett, and Amy, and her youngest child, and Lewis, a boy.

*Item* 8. At the death of my wife, I give unto my daughter Elizabeth Weddington, one half of the lot of land she lives on, to be taken off of the upper end of the lot, joining son John's land; also, a negro man named Isham, and his wife Hester, and Tildy and her children.

*Item* 9. I give unto Catharine May's children, formerly John May's wife, my daughter, Rose and her children, to be equally divided between Catharine May's children.

*Item* 10. At the death of my wife, I give unto Nancy Pace, son William's daughter, Judy, a girl, and Ellick, a boy.

*Item* 11. At the death of my wife, I give unto my daughter Polly May's children, Fillis, and her children; to be equally divided between them, at the death of my daughter Polly May; and at the death of my wife, I give unto my daughter Polly May, one negro girl named Lucindy.

*Item* 12. I give unto my daughter Lucy Burt's children, Martha and Mary, a negro woman Dinah, and her children, to be equally divided between them; and if any one of the girls should die without an heir of her body, the living one to take all.

*Item* 13. At the death of my wife, I give unto Mary Petty, a girl named Caty.

*Item* 14. I also appoint my wife, Polly Pace, executrix of this my last will (alone) and at her death, for each of my sons to have equal power as executors; that is, my living sons at that time, to-wit: William, Clement, John, Stephen and Elkanah. In witness whereof, I have hereunto set my hand and seal, this August 1st, 1847.

WILLIAM PACE, SR. [SEAL.]

GEORGIA, ⎰ In the name of God, Amen. I, William Pace, senior, of the county and State aforesaid, being in perfect mind and memory, but weak in body, and calling to mind the mortality of my body, and knowing that it is appointed for all men to die, do make and ordain this my last will and testament, as touching my wordly estate, wherewith it has pleased God to bless me in this life. I give and devise and dispose of the same, in manner, as follows:

*Item* 1. I give my soul to God who gave it, and desire my executrix, or executors, to have my body decently buried, that it may return to dust from whence it came, according to the word of the Lord.

*Item* 2. I desire that all my property, of every description, remain in the hands of Polly Pace, during her natural life, and

that she keep it together as it now is, and as my just debts come due, that she pay them out of the profits arising from the same. At the death of my wife, I want the property, as I will it away, to fall into the possession of those I will it to, and for them to take it in possession, and the balance of my estate, not willed away, of every description, to be sold by my executors at public sale, and divided among my living children; I mean them that are alive when the sale takes place.

*tem* 3. At the death of my wife, I give unto my son William Pace,

HARDY MAY.—Testimony of Hardy May in behalf of propounders, taken by interrogatories.

To the 1st he answers: He knows the parties.

*Interrogatory* 4. Are you acquainted with a negro woman by the name of Amy, the property of William Pace in his lifetime? If you are, state if you know when her child Chany was born, and also her child Susan. How many children has Amy, and which are the names of her youngest?

*Answer.*—I am well acquainted with a negro woman named Amy, the property of Wm. Pace, senior, deceased. Her child Chany was born in the month of August, 1847. I do not recollect at which time Susan the youngest was born.

*Interrogatory* 5.—Relate all you know that will benefit the propounders of the will.

*Answer.*—I know nothing more.

### CROSS INTERROGATORIES.

Are you not interested in having the said will established? How long have you known the negroes mentioned in the direct interrogatories? What means have you had of knowing them and their ages?

*Answer.*—I have no interest in having the will established. I have known Amy for the past seventeen years, and have lived at different periods, in that time, with William Pace, since five years, and this is the means I have of knowing Amy and her children.

F. W. PLEASANTS.—Frederick W. Pleasants, in behalf of propounders, testified by interrogatories, as follows:

To the first interrogatory he says, he knows the parties.

*Interrogatory 2.*—What is your profession?

*Answer.*—I am a medical practising physician.

*Interrogatory 3.*—Were you acquainted with William Pace in his life time? Do you believe he had mental capacity to attend to ordinary business? State your opinion and belief, and your reasons for it?

*Answer.*—I was acquainted with him. I do. I was frequently in conversation with him, and he reasoned well on all subjects that we conversed about.

*Interrogatory 4.*—Did you have any conversation with said William Pace, a short time before his death, about his will; and his intentions, as to any of his children or grand-children? If yea, state what he said about having such or any will; and which, if any or either of said children or grand-children, he did not intend to give anything more than he had formerly given them? How long before his death was such conversation?

*Answer.*—To the fourth interrogatory he answers: I did have a conversation with him about his will, on Friday before he died on Sunday, and he stated he had his will written, and also said he had two daughters that was dead, and James Burt had married one, and a gentleman named May had married the other, and that he did not intend that their children should have any more of his property than had been given to their mothers at their marriage. This conversation was on Friday before he died on Sunday.

*Interrogatory 5.*—Relate all you know that will benefit plaintiffs.

*Answer.*—I know nothing more.


## CROSS INTERROGATORIES.

1. Do you, in detailing any conversation with said William Pace, senior, state his words? Please give his language as nearly as you can. How long before the death of Mr. Pace

was said conversation, referred to? Where was it, when, and who was present?

*Answer.*—I have stated his words in language in the fourth direct interrogatory, as near as I can. It was at Zeno Weddington's, out at the horse-block. It was on Friday, before he died on Sunday. There was no person present but myself.

2. Did or did not said Pace speak of his will, if at all, as imperfect, neither proven nor published; and did he or not express himself not fully satisfied with the disposition he had proposed of making of his property. What did he say on this point? Did he not say he was in doubt how best to dispose of it, or something to that effect? and that he either had made or intended to make an equal distribution of his property? Declare fully.

*Answer.*—He said nothing on these subjects.

3. What property did he say he had, by said will, given to the children, or grand-children, who were to be cut out?

*Answer.*—The property which was given at the marriage of his daughters.

4. Did he speak of said will as one *already made*, or one he *intended to make?*

*Answer.*—He speaks of one already made.

### INTERROGATORIES OF WM. M. PERRY AND JACOB LAND.

To the first interrogatory—they say they know the parties.

*Interrogatory* 2. Were you acquainted with William Pace, senior, in his life-time? How long did you know him? How far did you live from him, and what were your opportunies of knowing him well? Especially as to his good mind, and capacity to attend to business of any sort?

*Answer.*—To the second interrogatory, they answer we were. 3d interrogatory. Wm. M. Perry answers twelve years. Jacob Land answers ten years. 4th. William M. Perry answers between four and five miles, and being a member of the same church, and being frequently in his company during eleven years previous to his death, I believed him to be capable of at-

tending to his own business.    Jacob Land answers one mile and a half, and being frequently in his company, and having him to write a bond for titles to land, and also to write a deed for land, I believe he was of sound            as any body to the day of his death.

*Interrogatory* 3. State whether, at any time during your acquaintance with him, he had other than a sound and disposing mind and memory, and give all reasons for such belief as you express.

*Answer.*—To the third interrogatory they answer: We never knew him to have other than a sound and disposing mind. Our views and reasons are given in the above interrogatory.— We have stated above how long we were acquainted with William Pace, and part of the time he was an official member in the M. E. Church, class-leader and exhorter, and he being frequently called on to write bonds and deeds, &c.

*Interrogatory* 4.—Relate fully all you know which will prove to the testamentary capacity of said William Pace during his life, and up to the time of his death, as if thereto particularly interrogated.

## CROSS INTERROGATORIES.

1. Who is and has been present with you before the commissioners, at the time of your examination upon these and the direct interrogatories?

*Answer.*—To the first interrogatory they answer: No person in the house but the commissioners.

2. Do you know anything which will benefit the caveator? If you do, tell it.

*Answer.*—To the second interrogatory they answer, we know nothing.

SARAH WALKER.—Sarah Walker testified, in behalf of the propounders, by interrogatories, as follows: To the first interrogatory she answers: I do know the parties.

*Interrogatory* 2.—Do you know a negro girl child named Susan, of which William Pace, late of said county, deceased, died possessed? If yea, when was the child born? What

was her age at the time of the death of said Pace? Whose child is the Susan of which you speak? Was it the last child of its mother at the death of said Pace?

*Answer.*—To the second interrogatory she answers: 1st, I do. 2d, I do not know. 3d, I suppose it was 8 or 9 months old. 4th, Amy. 5th, It was.

*Interrogatory* 3. What are your means of knowing the facts to which you testify in this case?

*Answer.*—I was living with said Pace at the time of his death, heard him and the family say the child was Amy's, and saw it suck her.

*Interrogatory* 4.—Have you heard said William Pace, deceased, say that his intention was not to give any more property to a portion of his sons-in-law, than he had already given them? If yea, which ones were they? When and where did you hear him speak of it, and what did he say on that subject?

*Answer.*—To the fourth interrogatory she answers: 1st. I did. 2d. James Burt and John May. 3d, In his house, about a month before his death.

## CROSS INTERROGATORIES.

1. Are not you and your husband living at this time with Elkanah Pace? Where have you lived since the death of William Pace? Were you present when Susan was born?— Where were you at that time? How do you know which was the last child of any of said William Pace's slaves, and especially the last one of the mother of Susan? When did you hear William Pace say any of the things which you are asked about in the direct interrogatories? Where did you hear him say it? Who was he talking to at the time? Who was present at the time? When did you first tell anybody about what you heard him say? Who did you first so tell? What made you tell? Who was present when you told?

*Answer.*—She answers: 1st, We are. 2d. At John Pace's, Larkin Davidson's, Elkanah Pace's, James Biggers', and Elkanah Pace's. 3d, I was not. 4th, I suppose I was in the

city of Columbus about that time.   5th, I never saw or heard
of any other.   6th and 7th, About a month before his death,
in his house.   8th, His wife and me.   9th, His wife and me.
10th, At Mr. Elkanah Pace's.   12th, I and her, (Mrs. Pace,)
in conversation about the law suit, I recollect to have heard
him, the said William Pace, deceased, say so, and I told her.
13th, No person but Mrs. Pace and me.

AMANDA WEDDINGTON testified in behalf of propounders, by
interrogatories, as follows:

To the first interrogatory she answers, she knows the parties.

*Interrogatory* 2.  Are you acquainted with a negro woman
by the name of Amy, the property of William Pace, senior, in
his life-time, and her children?  If yea, how many children
has she?   What are the names of the two youngest, and how
old are they?   When were they born?

*Answer.*—I know a negro woman named Amy, that was the
property of William Pace, senior, during his life time.   I also
know her children.   She has five children, viz: Lucy, Burwell,
Hannah, Chany and Susan.   Chany and Susan are the two
youngest.   Chany was born about the last of August, 1847.
Susan was born in the year 1849.   I do not now recollect the
time, or month she was born, but think it was in the month of
of May.

*Interrogatory* 3.  Relate all you know that will benefit the
propounders of the will.

*Answer.* To the third interrogatory she answers, I know
nothing more.

## CROSS INTERROGATORIES.

1.  Are you not interested in having said alleged will estab-
lished?   How long have you known the negroes mentioned in
the direct interrogatories?   What means have you had of know-
ing them, and their ages?

To the cross interrogatories, she answers as follows: I am
not interested in having said will established.   2. I have
known Chany and Susan from the time of their birth.   3. The
means I had of knowing them was by frequently seeing them

at Wm. Pace's, senior, my grandfather, and from that circumstance, recollect the years they were born.

#### EVIDENCE FOR CAVEATOR.—MRS. MARY PACE.

In behalf of the caveator, the testimony of Mrs. Mary Pace, taken by interrogatories, was first read, and is as follows:

To the first interrogatory she answers, she knows the parties.

*Second Interrogatory.*—Have you testified before by interrogatories in this case, in behalf of said propounders, with reference to the paper writing propounded as the last will and testament of William Pace, deceased.

*Answer.*—To the second interrogatory she answers, I have.

*Third interrogatory.*—Did you or not, upon a certain occasion, at the reading of said paper writing, on Tuesday, next day after the burial of said William, at his (then) late residence, in presence of Richard Dent, James G. Burt, Jesse Cox and perhaps others, say, upon the reading of said paper writing: "It is not the will the old man read to me", or words to that effect? If yea, whom did you mean, by the words "old man"?

*Answer*—To the third interrogatory she answers: I don't recollect of coming over any such words as therein named, or to the same effect, and do not recollect naming "old man" on the occasion, as I was not in the habit of calling Mr. Pace "old man".

*Fourth Interrogatory.*—Did you or not, then and there also, in the same company, and more particularly in the presence of Richard Dent, James G. Burt and others, say that "he" (meaning said William) "had left all his business unsettled", or words to that effect, and relate all you know to benefit said caveator.

*Answer.*—To the fourth interrogatory she answers: I did not say he, Mr. Pace, left his business unsettled, and I have nothing more to say that will benefit the caveator.

#### CROSS INTERROGATORIES.

1. If upon any former occasion you have been examined as a witness, in this case, please say, if your evidence then given,

as to the identity of the last will and testament of William Pace, senior, deceased, was correct, and repeat your reasons for so saying, or your evidence as then given.

*Answer.*—To the first cross interrogatory she answers : My evidence given on a former occasion in this case, is correct ; and my reasons for saying so are these : One night, late in the year one thousand eight hundred and fifty, Mr. Pace took his candle and sat down and wrote until I became tired and lay down.   After some time, he spoke to me, and asked me if I was awake, and told me to get up and he would read to me what he had been writing.   I got up and sat down by him, and he read this will over to me twice. and asked me how it would do ? and I said to him, I suppose that is your wish ?   He said that it was, and I told him that it would do very well, but one thing, that is, Lany is there given to William, who lives in Alabama, and I do not want her to go there ; so he immediately, according to my wish, put out Lany and inserted Chany in her place ; and then he disposed of Lany otherwise in the latter part of the will.

*Second Cross Interrogatory.*—If you made any such expression as inquired of in the third direct interrogatory, please state whether it was made in reference to the paper writing, which you formerly testified was the last will and testament of Wm. Pace, dec'd, or some other will which was then read ?— Were not several papers read, and when the true and last will was read, did you not recognise and remember it as the paper which your husband had last read to you, as his last will and testament ?

*Answer.*—To the second cross interogatory she answers : I do not recollect of making any such observation as asked in the third direct interogatory.   There was several papers read in my hearing, but when the last will was read to me, I knew it, for the reasons I have stated in the first cross interogatory.

*Third Cross Interogatory.*—If you made any allusion to your husband having left his business unsettled, please state fully what you intended thereby.

*Answer.*—To the third cross interogatory she answers : I do

not recollect saying, on that occasion, that my husband left his business unsettled.

*Fourth Cross interrogatory.*—Relate all you know that will benefit the propounders of the will.

*Answer.*—To the fourth cross interrogatory she answers: I have related all I know that will benefit the propounders of the will.

RICHARD DENT.—Caveator then introduced, as a witness, Richard Dent, who testified that he was present at the examination of the papers the day after the burial, and heard a paper partly read for a will, that sounded very much like the will propounded. He couldn't swear positively it was the same, but believed it was. If it was not the same, it was very much like it. While it was being read, after they had read on some considerable ways down, old Mrs. Pace said, "that is not the will the old man read to me that night; for that read to me by him for his will, cut out Stephen Pace." Mr. Burt was present, as also Mr. Cox, Mrs. Pace, John, Elkanah Pace and others.

JAMES G. BURT.—In further evidence, caveator introduced as a witness, James G. Burt, who testified that he was present at the examination, the day after the burial, that the paper writing propounded, was before them that day, as one of the papers found in the desk. It was the one read over in part, or wholly, by Stephen Pace, in the presence and hearing of old Mrs. Pace, and after he, Stephen Pace, had read down as much, he thought, as half of one side, the old lady exclaimed, "that is not the will the old man read to me that night"; and afterwards remarked, "well, it seems the poor old man is gone and left his business all unsettled".

He, witness, looked over the will after Stephen Pace, as he read, and noticed it particularly that day, interlineations and all, and could swear the paper writing propounded was the same then read, when the old lady, Mrs. Pace, made those exclamations. He knew it to be the same from its interlineations, appearance, &c. He farther testified, that he was father-in-law of John Mealing, the caveator. Did not hear Mrs. Pace

say when the will was read, and she uttered the exclamation testified to, "that the will the old man read to her, cut out Stephen Pace."

And in behalf of caveator :

JOSEPH M. DENT.—Joseph M. Dent testified that about a week or ten days before Mr. Pace, senior, died, he went over to his house to buy some oats ; he went alone, and bought some. He and the old man were alone when he bought the oats, as well as he remembers.   He did not have the money, then, to pay for them, and the old man told him he must bring it very soon, as he did not think he should live long : that he had made his will, and had executed it ; that he had settled his affairs and made his will, and it was not like his (witness') father's that could be torn into 100 pieces, for the want of witnesses. Witness further testified, that his father's will was signed and sealed by him, but had no witnesses.

## TESTIMONY FOR PROPOUNDERS.

JAMES TAYLOR.—In behalf of the propounders, James Taylor testified that he thought in the fall before the death of old Mr. Pace, he was bird hunting with Joseph M. Dent, and went to old Mr. Pace's ; they saw there a couple of stacks of oats, one of which had been re-stacked ; and talking about the quantity of oats in them, witness remarked, there was most in the newly stacked one.   Dent said the old dark looking one had the most in it ; and gave as his reason that the other had been newly stacked ; that he didn't hear Dent say anything about buying oats, nor did he hear him propose to buy any from the old man; as they were going to old Mr. Pace's, they passed by where the mother of Dent was living ; and Dent said they must slip by without letting the old lady see them.

## FOR CAVEATOR.

JOS. M. DENT.—Joseph M. Dent, in behalf of caveator, recalled, testified that the time when he was at old Mr. Pace's, as testified to by Taylor, was not the time when he went to buy the oats ; that he did go with Taylor, as Taylor had testified, the

fall before, but didn't go to buy oats, and didn't buy any, nor did he then propose to buy any, but afterwards, as he before testified, in February, he thinks, a short time before the old man died, he went over by himself to buy them, and did buy them; that he could prove by his brother Richard, the time when he bought them, and that nobody was with him, when he went by his house to buy them.

RICHARD DENT.—Richard Dent, re-introduced, testified, that in February before the death of old Mr. Pace, his brother Joseph came to him, to buy some oats. He could not supply him, as he had only one or two bushels left, but he told his brother that he thought that he could get some at old Mr. Pace's. His brother then went over and bought some; that he, witness, afterwards hauled them home for his brother. No one was with his brother when he went and bought the oats.

JESSE COX.—Cox, recalled by propounders, testified, that he did not hear the exclamation and expressions attributed to Mrs. Pace by witnesses Dent and Burt; and that he was present in the company, and among them during the time.

It is hereby admitted and agreed, that the within is a true and correct brief of the evidence had and produced on the trial of the said cause; and that the same, the Court thereto consenting, be lodged on file with the Clerk of the Superior Court, July 25th, 1853.

(Signed)    COLQUITT & WELLBORN, for Propounders.
            THOMAS & DOWNING, Atty's for Caveator.

The within brief of evidence lodged on file, in open Court, July 25th, 1853.
(Signed)                EDWARD BIRDSONG, Clerk.

Which application and motion for a rule *nisi* the said Court refused.

To which decision of the Court, the said caveator excepted; and assigns for error:

*First.* That the Court erred in overruling said objection of

caveator, to the legality of said Court, and directing said cause to proceed.

*Second.* That the Court erred in refusing to charge the Jury so, as aforesaid requested.

*Third.* That the Court erred in refusing said application and motion for a rule *nisi* for a new trial.

Judge BENNING having been of counsel in this case, did not preside.

G. E. THOMAS & S. JONES, for plaintiff in error.

M. J. WELBORN & H. HOLT, for defendant in error.

*By the Court.*—LUMPKIN, J., delivering the opinion.

[1.] The first exception in this case is, that the Court which tried it, was illegally constituted, and had no authority to hear and determine the cause. And this exception is founded on the following state of facts, to-wit:

That on Saturday, the fourteenth day of May, said Court being then in session, was adjourned over till Monday, the 23d day of May. That on Sunday, the 22d day of May, John R. Sturgis, the Clerk of said Court, died. That on Monday, the day following, His Honor, Judge Iverson, attended at the Court House in said county, with the Sheriff, and ordered the Sheriff to open the Court, which he did, by proclamation; and after a short time, on account of the death of the Clerk, the Judge directed the Sheriff to adjourn the Court, till the hour of 9 o'clock, A. M., the next day. That on the next morning the Court was opened, according to adjournment; and there being no Clerk, the Judge appointed Abram B. Ragan, as Clerk for the time-being; and after remaining a few minutes, the Judge left the court house without adjourning, saying he would suspend business informally and without adjournment, until Monday, the 6th day of June next, following, at 10 o'clock, A. M.

Now, the point of exception, as I understand it, is this:—

That to have made these several adjournments of the Court, and especially the last one *legal*, there must have been a Clerk duly appointed, to attest the minutes, &c.

It is admitted that the Act of 1842, (*Cobb's Digest*, 216,) confers the power upon the Judge of the Superior Court to appoint, temporarily, a Clerk, until the vacancy in the office can be filled by election. But it is insisted, that this Act, as well as those of 1819 and 1826, conferring the same power on the Inferior Court, (*Cobb*, 212, 213,) are unconstitutional and void. By the 9th section of the 2d article of the Constitution, it is declared that when *any* office shall become vacant, by death, resignation or otherwise, the *Governor* shall have power to fill such vacancy; and persons so appointed, shall continue in office, until a successor is appointed, agreeably to the mode pointed out by the Constitution, or by the Legislature. (*Cobb*, 1119.)

Originally, the Clerks of the Superior and Inferior Courts, were to be appointed in such manner as the Legislature might, by Law, direct. And this is still true as to Sheriffs. But by the 10th section of the 3d article of the Constitution, as amended in 1808, the Clerks of the Superior and Inferior Courts, are to be elected on the same day, as pointed out by Law, for the election of other county officers—that is, the first Monday in January. (*Cobb*, 1123.)

Hence, it is argued, that no one but the Governor had the power to fill the vacancy created by the death of Mr. Sturgis, the Clerk; and that when thus appointed, he would continue in office until the first Monday in January next, ensuing; and that, inasmuch as the Court could do no act—not even adjourn, without a competent Clerk to attest its proceedings, that it had no authority to act in June, 1853. But the Spring Term having lapsed, for want of a Clerk, the Court stood adjourned, by operation of Law, till the next semi-annual Term, in November.

We feel the force of this Constitutional objection. It would be doing it injustice, to say that it was plausible merely. It seems to my mind, at least, difficult to answer. Perhaps it is

for want of opportunity to give it a close investigation—it being unnecessary to consume time for that purpose at present.— For it is by virtue of this same 9th section and none other, that the Governor fills all vacancies in the Judiciary, the United States Senate, and all other offices under the Constitution.— And in no other case has it ever been supposed, that there was, or could be a concurrent power lodged anywhere else.— And yet, it is passing strange, that ever since 1819, at least, it seems to have been practically admitted, by all three Departments of the State Government, that the power to appoint Clerks and Sheriffs, *ad interim*, might be exercised by the Courts ; and it would seem to be one almost indispensable to the proper administration of justice.   Without this power, how many terms of the Court would fail?   The repeated re-assertion of this right, by the repeated legislation upon the subject, and acquiescence on the part of the Executive, would almost, of itself, render it Constitutional.   For, in this instance, we have not merely the concurrent action of *two* successive sessions of the General Assembly, but of a half a dozen, at least.

[2.] But fortunately, for ourselves as well as the country, we do not feel called on to decide this question.   In the view we have taken of the matter, it can be satisfactorily disposed of otherwise.   Our opinion is, that the exception itself, is based upon a false assumption ; and that is, that the office of Clerk is necessary to the existence of the Court.   While we hold that he is a very proper officer, to keep regular and fair minutes of all the proceedings of the Court of which he is Clerk—as he is required to do by the 34th section of the Judiciary Act of 1799, (*Cobb*, 573)—still, we are quite clear, that the Court can live and move and have its being without him.   It can keep its own minutes, by entering them itself, and signing them, as is now done ; and make its own adjournment from day to day, or for a longer time, to suit its own and the public convenience, without a Clerk.   Nor is there anything in our Statutes, which is repugnant to this conclusion.   There are some things, *perhaps*, which the Clerk alone can perform ; but as to adjournments, he has neither part nor lot in the matter.

And thus, without seeking to answer the Constitutional objection, which has been framed so artfully that the ends of the cords can with difficulty be perceived, we cut at once the Gordian Knot, and thereby extricate the case from the preliminary difficulty in which it was supposed to be entangled.

After the introduction of evidence on both sides, in connection with his charge to the Jury, the Judge was requested by the caveators to instruct them, that " If the will propounded disposes of real and personal property, and has an attesting clause, and no witnesses, they must find against the will, as to the personal, as well as the real property, unless the testator *declared it* as his intention that it should be good as to his *personal* estate".

We hold that the Court was right, in refusing to give the charge as asked. It is too restricted. It maintains that the presumption of Law against the will, under the facts assumed, can be rebutted only by the *declarations* of the testator; whereas, the true doctrine is, that extrinsic evidence of any sort, whatever, may be given in for this purpose.

The Jury having found for the will, the caveator moved for a new trial :

1st. Because the Court erred in overruling the objection to its own legality.

2d. In refusing to charge the Jury as requested.

3d. Because the verdict was contrary to Law.

4th. Because the verdict was contrary to evidence.

The motion for a new trial was overruled, and caveators excepted.

Having already disposed of the first and second grounds on which the new trial was asked, I will proceed to consider the two last together. Was the verdict, setting up the testamentary paper propounded, as the will of William Pace, warranted by the Law of the case, as applicable to the facts proven?

[3.] It becomes necessary, in the first place, to ascertain and fix accurately, the rule of Law which governs this case.

[4.] As to the disposition of personal property, I need scarcely remark, that no form is necessary. And often, the

nearer the instrument approaches to form, and falls short of complete formality, the more incomplete it becomes.

[5.] The elementary works teach, that a will may be informal, yet complete ; or formal, yet incomplete. And the question, in every such case, is not whether all is done which the Law requires ; but whether everything has been done which the party thought necessary.

[6.] For if it should appear, that he intended to add forms which are unnecessary, yet the instrument will be bad.

[7.] The intention of the testator must not only be final, as to the dispository clauses of the will, but as to the execution also.

[8.] The law has fluctuated at different periods upon this subject. But the rule laid down by Sir John Nicholl, in *Beaty vs. Beaty*, (1 *Addam's Eccl. Rep.* 154,) is now received as the true doctrine. He says, " As the natural inference to be drawn from an attestation clause at the foot of a testamentary paper is, that the writer meant to execute it in the presence of witnesses ; and that it was incomplete in his apprehension of it, until that operation was performed, the presumption of Law is against a testamentary paper, with an attestation clause, not subscribed by witnesses." The learned Judge admits, that the presumption against an instrument so circumstanced, but perfect in all its parts otherwise, is slight; yet, slight as it is, he holds that it must be rebutted by some extrinsic evidence.

All the adjudicated cases, conclusively establish that this was the uniform doctrine of the Ecclesiastical Courts, from an early period, until the decision of the Delegates, in *Cobbold vs. Baas*, (4 *Ves. Jun.* 201, *in notis.*) That case was decided in 1781 ; and we admit, bears a strong resemblance to the one under consideration. The Attorney had prepared the original draft of the will, in which *James Savage*, the testator, made several alterations ; but afterwards re-wrote the whole, in [a fair hand, and subscribed his name to each of the sheets, and to the last, affixed his seal. There, as here, the clause of attestation was not subscribed by any witnesses. The paper was considered imperfect by Dr. Calvert, the Judge of the Prerog-

ative Court, on account of this omission. But on appeal to the Delegates, Sir Wm. Henry Ashurst, Sir Beaumont Hotham and Dr. Mucham were of opinion that it being a will, both of real and personal property, it was upon the *reddendo singula singulis* construction—a perfect disposition of the personal estate ; and consequently, they reversed the judgment of the Prerogative Court.

But this case being decided after May, 1776, and before which, there had been an unbroken current of authority the other way, from the earliest date up to the year when it was made, cannot be considered as binding here, although it did, for some time, govern the English Courts.

In 1798 the Court of Delegates still followed this objectionable precedent, as they allowed it to be, in *Matthews vs. Warner,* (4 *Ves. Jun.* 194) ; and notwithstanding much dissatisfaction had been previously expressed at this innovation on the old practice. But on application to the King in Council, for a Commission of Review, the question was referred to the Lord Chancellor. In conformity with his opinion, a commission was issued to the Bishop of London, Lord Kenyon, Ch. Justice ; and Lawrence McDonald, Ch. Baron of the Exchequer ; Sir Wm. Scott, afterwards Lord Howell Brooke, one of the Justices of the Common Pleas ; and two Doctors of the Civil Law. In November, 1799, this Court, consisting as it did, of the most distinguished Judges and Civilians in England, reversed the decision of the Delegates, and restored the Testamentary Law of that country, as it existed there, at the commencement of our revolution.

[9.] The result, then, of this brief chronological review, as well as an examination of all the authorities collected in *Roberts on Wills, ch.* 1, § 17, as well as *Jarman on Wills, page* 94, *and notes, first American edition,* establishes the principle already announced, namely, that the writer must have intended the paper to operate as it stood, without any further act to complete it.

[10.] And that, although a paper may have all the legal requirements of a will, yet, if the testator, with a view to give it

efficacy, has chosen to prescribe to himself a special mode of execution; and afterwards fails to comply with these formalities, the inference to be drawn from this circumstance is, that he had not fully and definitely resolved on adopting the paper as his will.

Let us now apply this Law to the testimony in this case.

On the trial, a variety of testamentary papers were introduced. The will propounded, bears date the 4th of February, 1847. There are two other wills of the same date, and all in the hand-writing of the testator, and all signed by him. The will propounded for probate, has an attestation clause, but no witnesses. It disposes of real, as well as personal property.— It was found after the death of Mr. Pace, in one of the drawers of the family bureau, mixed up with other papers and the other wills, with no envelope, or label, or other mark of designation, to distinguish it from the rest.

Besides the three wills of the 4th of February, 1847, there was one found, bearing date the 30th of April, 1832, and which disposes of all of the testator's estate, real and personal, and which has an attesting clause, and is properly executed, having the requisite number of witnesses. Besides these, there was another, bearing date the 1st of August, 1847. None of the wills, except that of 1832, is properly attested. And but one other out of the five, has the attestation clause annexed to it; and that is another one of the three bearing date the 4th of February, 1847. Besides these five wills—all of which were read on the trial—there was another, without date, partially written out, in the hand-writing of the testator, and found with the rest, amongst his other papers in the secretary.

Now, let us see by which of the witnesses the propounders propose to prove, that the paper which they offered for record, contains the final purpose of William Pace, respecting the disposition of his estate. It is by Mrs. Mary Pace, the widow, and Dr. Frederick W. Pleasants. The former was examined twice—once by the propounders, and once by the caveators.— And what is the substance of her testimony? She states that she knows that it was the will and wish of her late husband,

that his *personal* property should be bequeathed as it is by this instrument; that she knows it to be the last will he made; and that it was written in July or August, 1850. It will be perceived, that thus far, the witness gives her opinion only.— Would this testimony alone, authorize the paper to go to record? Most clearly not. The Court and Jury must hear from the witness the facts from which she formed her opinion—for such it is merely—and see whether or not they justify the conclusion to which she came. Then, by reference to her further answers, she states fully the reasons of her belief, which are these: "One night Mr. Pace took his candle and wrote until she became tired and laid down. After some time he spoke, and asked her if she was awake—and told her to get up, and he would read to her what he had been writing. She did as requested, and he read over the paper twice, and inquired how she thought it would do? She replied, I suppose that is your wish. He answered that it was. I told him it would do very well, but one thing, and that was, that Lany was there given to William, who lived in Alabama, and that she did not want her to go there. So he immediately, according to her wish, erased Lany and interlined or inserted Chany in her place; and then disposed of Lany otherwise, in the latter part of the will". So much for Mrs. Pace, the witness mainly relied on to establish—not that her deceased husband was of sound and disposing mind and memory, when this paper was written, and that the whole is in his hand; but that it *is* his *will*, or what is the same thing in the present case, that notwithstanding the clause of attestation, he abandoned his intention of having it filled up. It has been suggested, that if the will was good in 1850, as testified to by Mrs. Pace, a change of mind must be shown subsequently, to defeat it. The failure to have it witnessed, keeps it open and unfinished. And therefore, there is no necessity to prove a subsequent change.

I have inspected, carefully, the original papers which were submitted to the Jury on the trial, and I think that there can be no doubt but that the will propounded was written in February, 1847; and that the alterations apparent upon its face,

and evidently of a later date, were probably made on the night to which the old lady's testimony refers. Mr. Pace, intending to make a will, for it is quite clear that he did not intend to die intestate; and equally so, that his intention as to the final disposition of his estate, was unsettled and ambulatory—I repeat, that intending to make a will, he commenced writing, and that is the paper partially drawn up, without date, which was found with the rest, and produced and read on the trial. He remembers, however, the old wills of 1847; and getting one of them, makes the interlineations which it exhibits. I forbear to state the reasons which lead almost irresistibly to this conclusion.

I submit the inquiry—is there a particle of proof to show that Mr. Pace had abandoned his intention of having this will attested? He certainly prepared a clause with that view, either in 1847 or in 1850. What is there in the evidence of Mrs. Pace, to manifest his purpose of dispensing with this formality? True, she testifies that she knows this paper to contain the will and wish of her husband, as to his *personal* estate. But does she know that he had given up his original design of having it witnessed? And what fact or circumstance does she state, from which it could be inferred that this paper was any more the will and wish of her husband, as to the *personalty*, more than to realty?

She says, that after he had written the will, he called on her to say whether she was satisfied with it. Satisfied with what? Why, undoubtedly with the disposition he had made of his property, and not with the form of the paper as it then stood. This question, we all know, is asked before the final execution of the will, in order that changes may be made, if thought advisable, upon consultation. It certainly establishes any thing, but the completeness of the paper, as to form.

The witness is under some mistake, as to the disposition of Lany. For, by reference to the will, that addition to it was unquestionably written at the same time with the body of the instrument. Besides, there is another will of 1847, containing the same provision.

Well, what does Dr. Pleasants swear? That he had a conversation with Mr. Pace, on Friday before he died on Sunday, in which he stated that he had his will *written*. This very language rebuts the idea that the will was *finished*. He did not say even, that the will was *made;* but simply that it was *written*. He died suddenly, three days afterwards. But this conversation was not in expectation of that event; and was long posterior to the period, when, according to the testimony of Mrs. Pace, the final alterations were made in his will.

[11.] In the case of *Beaty vs. Beaty,* already referred to, Sir John Nicholl well remarks: "That the mere vague declarations of testators, that they have made their wills, are not always to be implicitly relied on; and can never, standing singly, supply proof of due execution; or consequently of what is to be taken in lieu of it." "In common parlance," continues the learned judge, "a man may well say that he had *made* his will, when he has *written* a testamentary paper, though unfinished".

I propose, now, to test this case by some others which are reported upon the same subject. I will select a few only.

*Painter vs. Painter,* cited in *Merivale's Ch. Rep.* 512, arose on a will both of real and personal property. It was written by the testator, with his own hand. It was signed and sealed, and had a clause of attestation, but no witnesses. It was locked up with other papers of moment. The testator had frequently declared that he should leave a will; and that he meant that the same should operate on his personal property. He died suddenly, and this will was pronounced against.

*Stokes vs. Perry,* (*ib.*) is another case. Mary *Collett* made a will of real and personal property, all in her own hand writing; subscribed her name, but did not seal it. It had a clause of attestation, but no witnesses. She died suddenly. The will was found locked up in a chest of drawers, inclosed in a piece of paper, on which was written, in her own hand, "Mrs. Collett's will"; and on another part of it, "My will". On the evening prior to her death, the testatrix had asked her

nephew, as to her power of leaving two houses; and she then said, that she had left them, with some other things, to the very persons to whom they were bequeathed in the will. The will, however, was rejected.

It requires but ordinary powers of discrimination, to see how much stronger this case is, than the one at bar.

Another leading case, is *Walker vs. Walker*, 1 *Merivale*, 503, tried before the Court of Delegates, composed of three Common Law Judges, and five Doctors of the Civil Law.— Here, the testatrix made a will, of real and personal property, and signed and sealed it. A clause of attestation, in the common form, was subjoined, but not witnessed. And her will was found, at her death, in an envelope, on which was written: "I sign and seal my will, to have ready to be witnessed, the first opportunity I could get proper persons". It was decided that the will was not good as to the personal property.

It is conceded by counsel for the propounders, that if the will of Mr. Pace had been found in an envelope, with a superscription precisely similar to that on Mrs. Ann Walker's will, that it could not be established. This concession, which they were constrained, by authority, to make, we submit is fatal to their case. For the legal interpretation of a clause of attestation, without being filled up, is precisely, when written out in words, what was endorsed on Mrs. Walker's will.

Giving full faith and credit to all the testimony which is adduced to sustain this will, what does it amount to in Law? Nothing more than this: "My will is written—I have signed and sealed it—read it over to my wife, who, with certain alterations which she suggested, and which I have made, is satisfied with it. I have laid it aside to be witnessed, as I did with this same will, or with others, in 1847. And I intend to have this done at some convenient season, provided my mind does not undergo another change upon the subject".

*The Public Administrator of New York vs. Watts & Leroy ; and the same vs. J. L. Norton*, (1 *Paige*, 347,) is another leading case, in this country, where this whole doctrine is thoroughly reviewed. The testimony is too voluminous to cite the

facts.   Suffice it to say, that the Chancellor fully sustains the principles which we have laid down, namely: that this testamentary paper, showing from an inspection of it, that some other act or formality was supposed necessary by the testator, and was intended to be done by him before the same was to operate as a will; and there being no sufficient extraneous proof to counteract this presumption, it is an unfinished or unexecuted will, and is not valid for any purpose, unless the testator was arrested by death, before he had reasonable time to complete his will in the manner intended.

[12.] Here the caveators, being the next of kin, together with others of the deceased, and as such entitled to the distribution of the estate, if the will fails, the *onus probandi* is on the propounders.   They must make out a case by satisfactory proof, to prevent the distribution according to Law, of the decedent's estate.

[13.] What disposition, then, shall be made of this case? The 57th section of the Judiciary Act of 1799, (*Marbury Crawford's Digest*, 308,) provides, " that in any case which has arisen since the signing of the Constitution of 1798, or which may thereafter arise, of a verdict of a Special Jury being given *contrary to evidence, and the principles of justice and equity*, it shall and may be lawful for the presiding Judge to grant a new trial before another Special Jury, in the manner therein prescribed".

[14.] The 3d section of this late Statute, gives to the Judges the power to exercise a sound discretion in granting new trials, *only* where the verdict may be decidedly and strongly against the weight of evidence; whereas, under the old Law, the right exists wherever the verdict is contrary to evidence and the principles of justice and equity.

[15.] Under either of these enactments, both of which, I apprehend, are of force, there could be no difficulty in directing a new trial in this case; but we are not driven to take this broad ground, however justifiable we might be in so doing, under all the facts and circumstances of this case.   We propose to put our judgment upon the most restricted view ever held

by this or any other Court, and to say, that if there was any evidence, however slight, to rebut the presumption arising from the face of this paper, we would not disturb the finding.   But we affirm, after the most searching scrutiny by counsel, and careful examination by the Court, we do not find in the record one scintilla of proof, to rebut the legal presumption against the will, arising from the incomplete clause of attestation.

The testator seems to have signed and sealed this paper, as he did several others, so as to leave as little to do as possible— postponing the completion from some cause, and thus dying, without having executed it.    This is just the condition in which he left the wills of Feb. 1847 ; and just the condition in which he left that one of these three which he altered in the summer of 1850, up to the time of his death.

With these convictions upon our minds, and in the utter absence of all testimony, that Mr. Pace had a divided mind, as to his estate, supposing that he left the paper perfect as to the personalty, but incomplete and void as to the realty, we feel bound to remand this cause for a re-hearing.